# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00191-CV

---

**S. B., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 22ND DISTRICT COURT OF COMAL COUNTY
### NO. C2020-0653A, THE HONORABLE MELISSA MCCLENAHAN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

S.B. (Mother) appeals from the trial court's final order terminating her parental rights to her children: Gabe, born in May 2014; Zach, born in September 2015; Amy, born in March 2017; Kate, born in July 2018; and Dan, born in October 2019.[1] The children were removed from the parents' care on April 30, 2020, following a report of neglectful supervision related to an incident of domestic violence that had occurred two days earlier. After a final hearing held over two days on March 30 and April 19, 2021,[2] the trial court found that Mother had knowingly placed the children or allowed them to remain in conditions or surroundings that

---

[1] For the children's privacy, we refer to them by aliases and to their family members by their relationships to them. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Father's rights were also terminated, but he is not a party to this appeal.

[2] The final hearing was held via video conference due to COVID-19. *See* Supreme Court of Texas's Second Emergency Order Regarding the COVID-19 State of Disaster (Misc. Docket No. 20-9043) and all subsequent Orders.

endangered their well-being, engaged in conduct or knowingly placed the children with other people who engaged in conduct that endangered the children's well-being, and had failed to comply with a court order that established actions necessary for Mother to regain custody. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). Mother's sole issue on appeal is that the trial court erred in finding grounds under subsections (D) or (E) and asks that we either remand for a new trial or render judgment deleting those grounds from the termination order. As explained below, we affirm the trial court's order.

## STANDARD OF REVIEW

To terminate a parent's rights to her child, the Texas Department of Family and Protective Services must prove by clear and convincing evidence that the parent engaged in conduct amounting to statutory grounds for termination pursuant to section 161.001 and that termination is in the child's best interest. *Id.* § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). In reviewing legal sufficiency, we consider undisputed evidence contrary to the finding but assume that the factfinder resolved disputed facts in favor of its finding. *A.C.*, 560 S.W.3d at 630-31. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against the evidence favoring the finding and ask whether a reasonable factfinder could not have weighed the evidence in favor of the finding. *Id.*

2

Termination of the parent-child relationship may be ordered under subsection (D) if clear and convincing evidence establishes that the parent knowingly placed or allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being, Tex. Fam. Code § 161.001(b)(1)(D), and under subsection (E) if the evidence establishes that the parent engaged in conduct or knowingly placed the child with others who engaged in conduct that endangered the child's physical or emotional well-being, *id.* § 161.001(b)(1)(E). Subsection (D) focuses on the child's environment, while subsection (E) focuses on the parent's conduct and asks whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). When, as here, the evidence relevant to subsections (D) and (E) is interrelated, we may consolidate our review of the record. *Id.*

"The term 'environment' in subsection (D) refers not just to the suitability of the child's living conditions, but also to the environment produced by the conduct of the parents or others in the home," and "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home" is part of the environment under subsection (D). *Id.* Further, "a parent's failure to remove herself and her children from a physically violent or abusive relationship may support a finding of endangerment under subsection (D)." *Id.* Under subsection (E), in determining whether a parent "engaged in an endangering course of conduct, the factfinder may consider the parent's actions and inactions that occurred before and after the child was born" and may "infer that a parent's lack of contact with her child and absence from the child's life endangers the child's emotional well-being." *Id.* The Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.,*

3

384 S.W.3d 796, 803 (Tex. 2012); *see In re M.J.M.L.*, 31 S.W.3d 347, 350-51 (Tex. App.—San Antonio 2000, pet. denied) (endangerment must be direct result of parent's course of conduct but conduct need not be "specifically directed" at child, cause child actual injury, or "even constitute a concrete threat of injury to the child"). Stability and permanence are paramount in the upbringing of children, *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied), and a course of conduct that subjects a child to a life of uncertainty and instability endangers the child's well-being, *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see In re A.A.H.*, No. 01-19-00612-CV, 2020 WL 1056941, at *11-12 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.) (parent's continuing drug abuse may "qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being" because it "exposes the child to the possibility the parent may be impaired or imprisoned and, thus, be unable to take care of the child"); *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (evidence of parent's drug use or that parent allowed child to be around drug user may show "voluntary, deliberate, and conscious course of conduct" that endangers child); *A.C.*, 577 S.W.3d at 699 ("A parent's illegal drug use may constitute endangerment under subsection (E)."); *M.E.-M.N.*, 342 S.W.3d at 263 ("Drug use and its effect on a parent's ability to parent may establish an endangering course of conduct."). Indeed, a factfinder "is entitled to give 'great weight' to a parent's drug-related conduct, as it is considered a 'significant factor' supporting termination." *A.C.*, 577 S.W.3d at 705; *see In re L.G.R.*, 498 S.W.3d 195, 204 (Tex.

App.—Houston [14th Dist.] 2016, pet. denied). And a parent's decision to use illegal drugs while a termination suit is pending, and the parent is at risk of losing her child, may support a finding that the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *C.V.L.*, 591 S.W.3d at 751; *M.E.-M.N.*, 342 S.W.3d at 263.

## SUMMARY OF THE EVIDENCE[3]

New Braunfels Police Officer Matthew Burdick testified that on April 28, 2020, he responded to a call at a hotel about domestic violence between Mother and Father. By the time Officer Burdick arrived, Mother had taken the children to another hotel, but Father told the officer that the children had been present during the altercation. Father was "very erratic" and speaking rapidly, and he told the police that he had been assaulted and bitten by Mother and that it had "happened multiple times in the past." Father also asserted that Mother had tried to hang herself, that she had a history of attempting to harm herself, and that "she tries to do that every time that they have an altercation." Officer Burdick went to the second hotel and observed while Mother was interviewed by Officer Sylvia Martinez. He said Mother was "nonchalant, like she didn't care what was going on" and "wasn't caring about what was going on with the children." Because Mother seemed like she was not "all mentally there," Officer Burdick "felt like she was off or she might have been under the influence." Officer Burdick was asked what he recalled about the children's appearance, and he said, "They just seemed a little dirty. They just needed baths and they were hungry."

Officer Martinez testified that two of the children were with Mother and that the older child, a boy who she guessed was about five or six years old, was "a little hyper," kept

---

[3] We will only summarize evidence relevant to the (D) and (E) grounds.

5

interrupting the interview, and would not be redirected when Martinez tried to keep him occupied, for instance by giving him her flashlight to play with. Officer Martinez said his behavior was "a little unusual," but she "just kind of dismissed it" because she thought he might be hyperactive or have ADHD. Mother denied that Father had been the victim of an assault, although she later admitted that she had bitten him, and denied that she had tried to hang herself. She "appeared coherent" and said she did not want to get Father in trouble. Mother had "bags and bags of clothes for the children," but said she was going to return to Father because she did not have diapers or food. To keep the parents separated for the night, Officer Martinez brought Mother diapers, baby formula, and food. Officer Martinez said it was dark in the hotel room, so she could not testify about how the children looked or whether they had been properly cared for.

Law enforcement also testified that Mother and Father had been arrested in March and July 2020 after Mother was observed "purposely not ringing" up items at Wal-Mart's self-checkout stations. In March, Mother failed to scan about $470 of items and was arrested for theft, while Father was arrested for drug possession after he told the officer that he had crystal methamphetamine in his pocket and that he "keeps it on his person; that way it doesn't stay at home where his kids could get ahold of it." In July, several months after the children were removed, the parents were again arrested after they tried to leave with fifteen items that had not been paid for, totaling about $143. Both times, Mother denied that she had been trying to steal, saying "she was not paying attention" and that she would pay for anything she had missed.

Department investigator Vanessa Campanella testified that she interviewed the parents and five-year-old Gabe on April 29, 2020, after the Department received a referral for neglectful supervision alleging that after the parents' altercation, Mother "was suicidal and she had two children with her." Mother was "open about physical altercations" between her and

6

Father and told Campanella that Father "gets jealous and can't get over the fact that she slept with one of his relatives when they were no longer together." She denied drug use until she learned she would have to take a drug test, at which point Mother said that Father "forces her to use" crystal methamphetamine. Mother denied that she was suicidal and said Father "was the one that was suicidal. And that's why she came back to be with him." Father admitted to domestic violence and said that "he just can't trust her and she lies all the time, so she makes him do it." Father also admitted to using crystal methamphetamine twice a day, saying he "kept it on him at all times."

Campanella explained that at the time of the referral about the parents' altercation, the family was living in a hotel room, which was dark and "very cluttered. There was stuff everywhere. They could barely walk in there." All the children shared a bed, while the parents shared the other bed. While Campanella was speaking to the family, some of Father's relatives arrived and "acted like there was a party going on." Campanella said that while she was speaking to the family, three-year-old Amy "ran out in the middle of the parking lot and almost got hit by a vehicle." Although Campanella reacted, Mother and Father "acted like it was normal and there was no reaction from them." When she spoke to Gabe, he described his parents' fight. He "talked about parents fighting a lot," about "Mom getting choked by Dad," and "about Dad being jealous of Mom because she slept with another man," saying he "could show [Campanella] how the physical altercation occurred." Gabe also talked about his "parents having sex" and how he "could watch them have sex." Gabe used "cuss words" as if they "were very normal"—when Campanella asked Gabe about watching his parents have sex, he replied that "he would ask his dad, 'What are you doing mother fucker.' It was common language for him. He didn't bat an eye when speaking like that." Campanella agreed that Gabe had been "very sexually exposed."

7

Campanella testified that after she tried unsuccessfully to find a family member who would be an appropriate "safety plan," she asked Mother "if she'd be willing to go to the shelter with the children for the night" while the Department worked out a safe situation. Mother responded that "she would rather the kids go to the shelter" and that she "wasn't going to leave" Father. At that point, Campanella removed the children and took them to a Department office to find a placement. Campanella said, "We ended up giving the children baths within the Department because they were so filthy." She also testified that the children "appeared very neglected," saying that Dan "looked like he hadn't been bathed in a while or taken care" of and was "raw" under his neck and under his arms. She also observed at the hotel that he "was in a car seat and doesn't look like he's been out of the car seat very often." Amy had a bruise on her forehead, while one-and-a-half-year-old Kate was visibly dirty and had a red mark above her eye, marks on and around her nose, dried feces on her vagina, and a foul odor. Zach's forehead was "misshaped" and "bent down a little bit," and Gabe was "the cleanest out of them all, but his hair was still matted." The Department introduced into evidence photographs taken of Dan, Amy, and Kate the night of their removal. In those photographs, the children's skin is visibly dirty, their bodies and faces show scratches or bruises, and Dan's underarms and neck appear raw and irritated. Campanella testified that a photograph showing grime on Kate's face and torso showed "[t]he dirt and the stickiness of her, the unkeptness that we—we found on her."

The parents and children were tested for drugs after the children's removal; Mother, Amy, Dan, Gabe, and Kate all tested positive for methamphetamine and amphetamine;[4] and Campanella testified that the children's levels were "very high; higher than the parents' levels." Mother's level of methamphetamine was 7402; Gabe's was 11,837; Amy's was 13,140;

---

[4] Zach's hair was too short to be tested.

8

Kate's was 25,587; and Dan's was 149,468. Campanella said those levels indicated that "the parents were using around" the children or that the children "had access to the drugs." She agreed that even if the children had not appeared to have been neglected, their drug levels "would have necessitated a removal."

Caseworker Venus Alvarez was assigned to the family in May 2020 and testified that because of the children's positive drug tests, the Department and the parents entered into an agreement under which the parents had to undergo drug-and-alcohol evaluations and enter ninety-day, in-patient drug-treatment programs by July 24, 2020. Alvarez testified that Mother denied having a drug problem when she did her evaluation, while Father "took no responsibility for anything" that had led to the children's removal. In addition, Mother was unsuccessfully discharged after seven days from her first drug-treatment program, which she entered in August 2020. She then entered a second program in October and told Alvarez in November that she had been successfully discharged. However, when Alvarez requested Mother's records, she learned that Mother had been discharged on October 24, after only ten days, when she "put in her four-hour notice and decided to leave the treatment."

Alvarez also testified that Mother missed three drug tests in the summer of 2020; tested positive for methamphetamine on June 17; tested negative on July 2; had a negative urinalysis and a positive hair follicle test on the same day in November; missed seven requested tests between December 15, 2020, and March 2, 2021; had one negative test in mid-March; and tested positive on March 31. Mother's visitations with the children were stopped in July 2020 because she had not yet entered the treatment program and was not following her agreement with the Department. In addition, Mother had been unsuccessfully discharged from individual therapy due to repeated no-shows, had been unresponsive when Alvarez attempted to contact

9

her, did not take a domestic violence intervention program, and had never obtained employment. Mother had made progress on setting up appropriate housing, had taken a parenting class, and had completed a psychological evaluation.

Finally, Alvarez testified that the children had been placed together in a foster home, with foster parents who were willing and able to adopt them. The younger children had some developmental delays when they were removed, but they had overcome those delays and were thriving. The children were working through "some things," especially Gabe and Zach, and Alvarez explained that Gabe and Zach get "very anxious about what's going to happen to them" and always ask Alvarez for news about their situation. Gabe is old enough to "understand[] what's going on" and "knows more than a six-year-old should," and Alvarez agreed that "with respect to" Gabe's language, he has shown "a complete 180-degree turnaround." The children were doing well in school, and their teachers "have no concerns."

Mother denied that the children had seen her and Father fight physically. She pled "the Fifth" in response to many of the Department's questions,[5] including when she was asked if her children, specifically Gabe, had seen her and Father having sex and when asked why Amy's "private areas were the way it was [sic]." Mother testified that she did not know why Dan's underarms were raw, saying that he was always bathed and that it might "be the sweat."

Mother pled the Fifth when asked about her positive drug tests; testified that she knew her missed tests were presumed to be positive; testified that she did not feel that she had a drug problem; and then pled the Fifth when asked, "But you continue to use?" She also pled the Fifth when asked if the children were present when she used methamphetamine but said she was aware that her children had tested positive for the drug. Mother testified that she had requested

---

[5] *See* U.S. Const. amend. V (right against self-incrimination in criminal case).

her last follicle test because she "was positive" it "would come out okay. But I guess not." Mother testified that she left the second treatment program because her house had been broken into and she had to "find out what was going on." She testified that she told program personnel why she was leaving and that they advised her not to, informing her she could not return if she left. She admitted that she had not told her caseworker when or why she left, saying, "I wasn't in my head," and that "it happened so fast."

Mother also testified that her therapist had said she had to reschedule but then never responded to Mother's attempts to contact her. Mother said that she had completed the parenting class, two drug and alcohol evaluations, and a psychological evaluation; that she had appropriate housing; and that she had started a job about a month earlier. She testified that she had tried to do "some" of her required services, acknowledged that "it may seem like I haven't," and explained, "I just get real stressed and I feel like I have no hope. And I know maybe y'all might not understand that, but it's just, they're the only family I have." Mother was no longer in a relationship with Father and was five months pregnant with a "friend's" child but that friend was not going to help raise the baby, and Mother said, "I'm by myself."

## DISCUSSION

Mother asserts that the proximate cause of the children's removal "was the children being in the presence of a domestic violence incident along with [Father's] admissions of regular drug use" and that there was no evidence in the Department's removal affidavit that Mother "had ANY confirmed history with the Department."[6] She contends that the Department's "small battalion of law enforcement" witnesses did not provide "particularly

---

[6] Campanella's removal affidavit states, "Mother reports that she has had two previous cases for physical abuse on the older two boys, however it was not found in our system."

11

insightful" testimony about whether the children were endangered and attempts to downplay or cast doubt on the Department's evidence, asserting that "NO professional medical, psychological, or developmental specialist testified whatsoever about any actual or existential harm or endangerment foisted upon the [children] by [Mother's] actions or environment." However, Campanella testified that Mother and Father did not react when Amy ran in front of a car, that Gabe reported seeing his parents fight and have sex, and that Father admitted that the children had been present during the April 2020 altercation and other instances of domestic violence. The children were visibly filthy when removed, the younger children had some developmental delays, and Gabe "knows more than a six-year-old should."

In addition, we cannot ignore the evidence about Mother's ongoing drug abuse. Mother, however, argues that she "flatly denied that she had a 'drug problem'" and "testified at some length about all of the services and progress she had engaged in and/or accomplished," and, thus, that the Department did not present any "real evidence of a causal nexus between [Mother's] alleged drug use and endangerment of the [children], either real or hypothetical." Mother quotes our opinion in *M.D. v. Texas Department of Family & Protective Services* as saying, "[S]omewhere along the way, [that court of appeals] conflated drug use with child endangerment such that mere drug use became conclusive evidence that a child was endangered." No. 03-20-00531-CV, 2021 WL 1704258, at *8 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.). However, that statement was included in a parenthetical quoting our sister court's opinion in *In re L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc)). Importantly, we cited our sister court's case under a "but see" signal, *see M.D.*, 2021 WL 1704258, at *8, meaning that statement in *L.C.L.* "clearly supports a proposition contrary to the main proposition," *see* The Bluebook: A Uniform System of Citation R. 1.2 (c)

(Columbia L. Rev. Ass'n et al., eds., 21st ed. 2020). Contrary to Mother's contention, we did not suggest that endangerment must be independently established and may not be inferred from parental misconduct alone. *See M.D.*, 2021 WL 1704258, at *6 n.4 ("We recognize that 'endangerment' does not need to be established as an independent proposition but may, instead, be inferred from the parental misconduct alone."). Instead, we observed that "because it exposes the child to the possibility that the parent may be impaired or imprisoned, a parent's illegal drug use and drug-related criminal activity may support termination under subsection (E)."[7] *Id.* at *8.

Mother and the four children whose hair was long enough to be tested all tested positive for methamphetamine at the outset of the case, with the children testing at very high levels, considerably higher than Mother's levels. Mother continued to test positive throughout the proceeding, was unsuccessfully discharged from two drug treatment programs, misled her caseworker into believing she had successfully completed the second, and testified that she did not believe that she had a drug problem. Further, Mother missed many of her required drug tests, from which she acknowledged the trial court could have inferred that she would have tested positive. *See, e.g.*, *J.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00814-CV,

---

[7] *M.D.* presented vastly different facts than this case: the child was removed while still in the NICU, based on concerns that the parents had not visited often enough, had missed some of the child's medical appointments, and had not both demonstrated that they could insert a feeding tube. *M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258, at *6 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.). There was also testimony about the Department's involvement with the mother's older son after allegations of neglect, which resulted in the mother being named possessory conservator, while the child's foster parents were appointed permanent managing conservators. *Id.* at *7. And although the mother tested positive for methamphetamine while the case was pending, she tested negative soon after, her doctor testified that several of the mother's medications could have resulted in a positive methamphetamine result, and her therapist testified that she had seen no signs of any drug use. *Id.* at *7-9. Finally, the evidence indicated that the parents had complied with the Department's requirements and had addressed the concerns that led to the Department's involvement. *See id.*

2019 WL 1646268, at *2 (Tex. App.—Austin Apr. 17, 2019, pet. denied) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). And "[a]lthough a witness may assert her Fifth Amendment right against self-incrimination in a civil trial if she is asked a question that might tend to subject her to criminal responsibility, the [factfinder] may make negative inferences based upon the assertion of the privilege." *V.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00746-CV, 2019 WL 1388725, at *2 (Tex. App.—Austin Mar. 28, 2019, pet. denied) (mem. op.) (citing *Texas Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995)); *see Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"). Mother pled the Fifth repeatedly, including in response to questions related to her drug use, the children's exposure to drugs, whether Gabe had seen his parents having sex, and the condition of Amy's "private areas."

The record contains evidence of repeated domestic violence, at least at times occurring while the children were present; Mother's ongoing drug use; the children's exposure to such drug use; the children's poor hygiene when removed; Mother's failure to engage in services intended to improve her and the children's situation; Mother's criminal conduct, twice resulting in her arrest, both shortly before and during the children's removal; and Mother's having had no visitation with the children since July 2020 due to her own conduct. We hold that the Department presented clear and convincing evidence from which the trial court could have concluded that Mother engaged in a course of conduct that endangered the children's well-being and that she placed them in circumstances or surroundings that endangered their well-being. *See, e.g., R.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-16-00528-CV, 2016 WL 6575235,

14

at *3-4 (Tex. App.—Austin Nov. 3, 2016, no pet.) (mem. op.) (mother admitted to having used methamphetamine weekly for past eight years; police officers had responded to three reports of domestic violence involving her and husband, who was also a methamphetamine user; and mother had no negative drug tests during case and did not complete domestic-violence classes or drug-addiction services); *J.C.-O. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-16-00271-CV, 2016 WL 6068263, at *7 (Tex. App.—Austin Oct. 14, 2016, pet. denied) (mem. op.) (evidence of domestic violence between parents, father's enabling mother's drug abuse during case, and "volatile nature of their ongoing relationship"); *R.Z. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00412-CV, 2014 WL 5653272, at *6 (Tex. App.—Austin Oct. 29, 2014, no pet.) (mem. op.) (evidence of illegal drug use, domestic violence, and criminal activity before and after child's removal). We overrule Mother's sole issue on appeal.

## CONCLUSION

Having overruled Mother's issue, we affirm the trial court's order of termination.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: August 25, 2021

15